Filed 1/29/16  P. v. Alonzo CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>GONZALO ALONZO,<br><br>     Defendant and Appellant. | B248995<br><br>(Los Angeles County<br>Super. Ct. No. BA321933) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Affirmed.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Defendant and appellant Gonzalo Alonzo raises contentions of sentencing error, an improper denial of his motion for a continuance, and ineffective assistance of counsel following his conviction of four counts of premeditated attempted murder, with gang and firearm enhancements. In our initial opinion in this matter (*People v. Alonzo et al.* (Sept. 27, 2012, B217909, B236117, B235942) [nonpub. opn.]) (hereafter, *Alonzo I*),[1] we vacated Alonzo's sentence of 160 years to life because he was only 17 years old when he committed these crimes. We remanded to the trial court with directions to resentence Alonzo because of recent changes in Eighth Amendment doctrine regarding the sentencing of juvenile offenders. On remand, the trial court imposed a sentence of 40 years to life. Alonzo has now appealed from that sentence.

For the reasons discussed below, we will affirm the judgment.

## BACKGROUND

*Alonzo's trial.*

a. *The aborted plea bargains.*

On the eve of trial in this matter, in early 2009, the defendants and the People negotiated the following plea bargains: Alonzo was to receive a 20-year prison term, and his codefendant Jaime Cabrales was to receive an eight-year term. However, a fairly heated dispute arose as to whether the parties had submitted the proposed plea bargains to the trial court in a timely manner. Defense counsel attempted to convince the trial court they had reasonably understood the court to have merely said it preferred to have any proposed settlement submitted for approval at least one week prior to trial, whereas the trial court maintained it had informed the parties that this was an actual deadline. The trial court refused to consider the proposed plea bargains and the matter went to trial.

Following their convictions, one of the defendants' contentions on appeal was that their convictions had to be reversed because the trial court refused to consider

---

[1] We take judicial notice of this unpublished opinion. (Evid. Code, § 452 subd. (d); Cal. Rules of Court, rule 8.1115(b).)

accepting the negotiated plea bargains. The defendants argued the trial court had violated their rights by enforcing a personal policy of requiring plea bargains to be completed a week prior to trial, a personal policy that had never been properly promulgated as a local rule of court. The Attorney General, however, argued the trial court had not been enforcing some general personal policy, but rather that the record showed the court had merely ordered the parties *in this case* to have any proposed plea bargains submitted for approval by a certain date.

Because the appellate record did not contain reporter's transcripts for several of the crucial pretrial conferences, it would have been difficult on appeal to sort out exactly what transpired. However, we concluded the defendants could not demonstrate any resulting prejudice from the alleged constitutional violations because, as the record made clear, the trial court would have rejected the proposed plea bargains as too lenient even had its submission deadline been met.

b. *Trial evidence.*

We include here an abbreviated statement of the facts underlying Alonzo's convictions, taken from our initial opinion in this matter. Viewed in accordance with the usual rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

At about 10:30 p.m. on April 27, 2007, Ricardo Salas, Arturo Torres, Carlos Ocampo and Jose Ocampo were in front of a house on Thomas Street when a gray or white Dodge truck with three occupants passed by. Someone in the truck yelled out, in Spanish, "[W]hat's up, faggots?" The driver leaned back, allowing one of the passengers to point a gun at them. Four or five shots were fired. One of the bullets hit Jose in the side and another bullet hit the house. The truck drove off. Jose was treated at a hospital and released.

Los Angeles Police Officer Benjamin Aguilera and his partner happened to be on patrol in the immediate area and heard the gun go off. They were already driving toward the gunshot sounds when they heard the radio report giving the address of the shooting; they arrived at the scene within a minute. Aguilera testified Salas reported

3

having seen a white or gray pickup truck with an extended cab coming south on Thomas Street, that someone yelled something, and that the truck's front seat passenger extended his arm out and fired a gun. Salas said he ducked for cover and last saw the truck turning left onto Manitou Avenue. The officers broadcast a description of the truck.

Los Angeles Police Officers Jason Smith and Rafael Hernandez were on patrol in the Lincoln Heights neighborhood when they heard the truck description over the radio. Because they knew that some members of the Eastlake gang lived on Thomas Street, the officers thought this incident could be a gang shooting. They drove to 2105 Keith Street, a known hangout of the Lincoln Heights gang, which was a rival of the Eastlake gang. When they arrived, shortly after 10:30 p.m., there was a silver Dodge truck parked on the street and Smith saw a man sitting on the stairs of 2105 Keith Street. When Smith aimed a spotlight at him, the man ran toward the back of the house. Smith went around to the next street in an attempt to intercept him. In the backyard of an adjacent house, Smith discovered a revolver.

Defendant Alonzo, then 17 years old, was subsequently discovered hiding inside a bedroom at 2105 Keith Street. Codefendant Jaime Cabrales was apprehended on the street around the corner from 2105 Keith Street.

At an in-field show up conducted later that same night, Salas and Torres identified Alonzo as the gunman, and Salas identified Cabrales as the driver. Salas and Torres both identified the Dodge truck, which was registered to Cabrales. Alonzo's right hand tested positive for gunshot residue. The fingerprints of both Cabrales and Alonzo were found on the truck.

Forensic evidence showed that the revolver recovered by Officer Smith could have shot the bullets that were fired at the victims.

Officer Rick Huerta testified as a gang expert. He had spent three years working as a gang officer in territory controlled by the Lincoln Heights gang. The gang's primary activities included robberies, drug sales and drive-by shootings. Huerta testified Alonzo and Cabrales were members of the Lincoln Heights gang. Huerta

4

opined the shooting had been carried out to benefit the Lincoln Heights gang because it was directed at people in a rival gang's territory.

     c. *The initial judgment against Alonzo.*

The jury convicted Alonzo of premeditated attempted murder (four counts), assault with a firearm (four counts), and shooting at an inhabited dwelling (one count), with criminal street gang, arming, great bodily injury, and firearm enhancements (Pen. Code §§ 664/187, 245, 246, 186.22, subd. (b), 12022, 12022.7, 12022.53, 12022.55).[2]

The trial court sentenced Alonzo to a term of 15 years to life,[3] plus 25 years to life for a firearm enhancement (§ 12022.53, subd. (d)), for each of the four attempted murder convictions. The court then ordered Alonzo to serve the four 40-years-to-life terms consecutively, for a total sentence of 160 years to life. The trial court stayed sentencing on all the remaining counts pursuant to section 654's prohibition on multiple punishment for the same act.

     d. Alonzo I.

In *Alonzo I*, we rejected Alonzo's claimed trial errors, including his contention the trial court had erred by refusing to give any consideration to the proposed plea bargain. However, we held that Alonzo's 160-years-to-life sentence violated the Eighth Amendment under recent United States and California Supreme Court case law regarding the sentencing of juvenile offenders to prison terms that prevent any possibility of rehabilitation and eventual release. For that reason, we vacated Alonzo's sentence and remanded his case to the trial court for resentencing.

---

[2]    All further statutory references are to the Penal Code unless otherwise specified.

[3]    Premeditated attempted murder carries a life sentence, with a minimum parole-eligibility period of seven years unless some other provision establishes a greater minimum term. (See *People v. Jefferson* (1999) 21 Cal.4th 86, 97.) The gang enhancement statute extends that minimum parole eligibility term to 15 years. (§ 186.22(b)(5).)

**CONTENTIONS**

Alonzo contends:  (1) his Sixth Amendment right to retain counsel of his choice was violated when the trial court refused to grant a continuance; (2) his sentence of 40 years to life violates the Eighth Amendment; and (3) he was denied the effective assistance of counsel at his resentencing hearing.

**DISCUSSION**

1. *Trial court did not err by failing to grant continuance for Alonzo to retain counsel.*

Alonzo contends the trial court violated his Sixth Amendment right to counsel when it refused to grant a continuance so that he could pursue retaining private counsel to represent him at the resentencing hearing.  There is no merit to this claim.

a. *Legal principles.*

An improper interference with a defendant's right to retain counsel of choice is a structural error requiring reversal of any ensuing conviction.  "The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.'  We have previously held that an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him.  [Citations.]"  (*United States. v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144 [126 S.Ct. 2557].)  "[T]he right at stake here is the right to counsel of choice, not the right to a fair trial; and that right was violated because the deprivation of counsel was erroneous.  No additional showing of prejudice is required to make the violation 'complete.' "  (*Id*. at p. 146, fn. omitted.)  "Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received.  To argue otherwise is to confuse the right to counsel of choice – which is the right to a particular lawyer regardless of comparative effectiveness – with the right to effective counsel – which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed."  (*Id*. at p. 148.)  "We have little trouble concluding that erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily

unquantifiable and indeterminate, unquestionably qualifies as "structural error." ' [Citation.]" (*Id*. at p. 150.)

"California decisions in this area reflect a determination that respect for the dignity of the individual shall be maintained within the context of enforcing the criminal law, and that a reasonable accommodation of seemingly conflicting values shall thereby be achieved. Thus, though it is clear that a defendant has no *absolute* right to be represented by a particular attorney, still the courts should make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney. [Citation.] . . . [¶] . . . [T]he state should keep to a necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best, using any legitimate means within his resources – and that that desire can constitutionally be forced to yield only when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." (*People v. Crovedi* (1966) 65 Cal.2d 199, 207-208, fns. omitted.) "In other words, we demand of trial courts a 'resourceful diligence directed toward the protection of [the right to counsel] to the fullest extent consistent with effective judicial administration.' [Citation.]" (*People* v. *Ortiz* (1990) 51 Cal.3d 975, 982-983.)

At the same time, however, the grant or denial of a motion for continuance rests within the sound discretion of the trial court. " 'A continuance in a criminal trial may only be granted for good cause. [Citation.] "The trial court's denial of a motion for continuance is reviewed for abuse of discretion." [Citation.] "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." [Citations.]' [Citation.] 'The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked. [Citation.] [¶] Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being

considered. [Citations.]' [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1181.) "The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. [Citation.] Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. [Citation.] There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. [Citations.]" (*Ungar v. Sarafite* (1964) 376 U.S. 575, 589-590 [84 S.Ct. 841].)

   b. *Procedural background*.

The parties' initial appearance on remand was apparently a hearing on March 15, 2013, before the Honorable Curtis B. Rappe, who had overseen the trial. Alonzo appeared with David Slater, the appointed counsel who had represented him at trial. At this time the matter was continued for one month. The minute order recording this continuance gives no indication who requested it or why it was granted. The Attorney General's brief on appeal seems to assert this first continuance was granted at Alonzo's request; while Alonzo's briefing implies otherwise, it does not directly dispute the Attorney General's characterization.[4]

On April 12, 2013, the parties' second appearance on remittitur, Slater asked for a one-month continuance because "[Alonzo's] family wants to try and hire an attorney

---

[4]      In his opening brief, Alonzo states: "On March 15, 2013, appellant first appeared on the remittitur with his previously appointed defense counsel David Slater, and the matter was continued one month to April 12, 2013. On April 12, appellant again appeared with appointed counsel and requested a one-month continuance in order to hire an attorney for resentencing." The Attorney General's brief states, "[T]he trial court had already given appellant one 30-day continuance, and a second 14-day continuance, to prepare for a simple sentencing proceeding." In his reply brief, Alonzo does not dispute this characterization of the events.

8

for [re]sentencing." Asked what efforts had been made to hire new counsel, Slater said the family had spoken to a few attorneys: "[T]hey would be representing Mr. Alonzo for the resentencing and I think they're also speaking to an attorney for some federal appeals issues, a different attorney. I don't know the situation. I haven't really spoken with the family all that much." When the court remarked, "It's just here for resentencing under recent changes in the case law . . . ," Slater replied, "[M]aybe a new attorney will have some . . . new thoughts that I don't have. I don't know. I do know they wanted to try to hire a new attorney . . . ."

The prosecutor then said: "What I've said to Mr. Donahue [one of the potential new attorneys mentioned] . . . but, more importantly, [to] David Slater, his current attorney of record, the only thing the court could do in this case is the court could run it concurrent and maybe strike the gang allegation. That would reduce it to thirty-two to life. [¶] But I don't think legally anything more can be done in light of the charges that the jury found to be true so I've asked for a forty to life which is running . . . the four imposed sentences concurrent to one another. [¶] The gang allegation is strikeable.[5] That would essentially turn it . . . [to] thirty-two to life. [¶] I think . . . that's the most . . . the court can do in light of the remittitur. [¶] So, in my opinion, it's either forty or thirty-two and the People are asking for forty."

When the trial court asked for clarification about the attorney the family was trying to hire, the following colloquy occurred:

"Mr. Slater: I know, they've spoken with Mr. Donahue . . . . I know the family has not hired him yet. And they're also speaking with another attorney . . . with the first name Nellie that they want to hire for the sentencing and I think Mr. Donahue would be here for the sentencing but –

---

[5]    Now pending before the California Supreme Court in *People v. Fuentes*, review granted August 13, 2014, S219109, is the question: Does the trial court have the power under Penal Code section 1385 to dismiss a Penal Code section 186.22 enhancement for gang-related crimes, or is the court limited to striking the punishment for the enhancement in accordance with subdivision (g) of section 186.22?

9

"The Court: And how much time is that attorney going to then need?

"Mr. Slater: He really didn't say. [¶] Mr. Alonzo is asking the court for a month. That way he can file any paperwork he needs –

"The Court: Why is it going to take a month to hire a lawyer? [¶] You're either going to hire them or you're not.

"Mr. Slater: Well, if he needs to file a motion and [the prosecutor] has time to respond –

"The Court: Well, I'm [not] going to put it over for a month. He's not going to have a lawyer who is going to say I want more time and then get another lawyer. It's one thing for him to put it over to hire a lawyer and for that lawyer to come in and be prepared by a certain time.

"Mr. Slater: I understand.

"The Court: Because I've been in these situations before. The lawyer comes in. They want a whole transcript of the whole trial and dah, dah, dah, dah, dah. [¶] I mean, this is a very narrow issue. This isn't something where the lawyer is going to come in and file a new trial motion or file a collateral attack or something like that. It's a very narrow issue. [¶] So I want you to make sure that the lawyer who comes in is going to be prepared to proceed on this in a reasonable time and brief it so –

"Mr. Slater: Well, I think if the court would give Mr. Alonzo a month and just no further continuances and if someone contacts me I'll just make sure they know there is going to be no further continuances.

"The Court: Well, what efforts have they made to hire a lawyer?

"Mr. Slater: Well, the family has told me that they're in the process of hiring a lawyer.

"The Court: What's that mean? [¶] When did they talk to the lawyer and . . . why hasn't the lawyer been hired yet and what needs to be done before the lawyer is either hired or not?

"Mr. Slater: . . . [T]hey said they're in the process of signing [a] . . . retainer agreement or the contract but it has not been completed yet.

10

"The Court: If they're that close I'll put it over two weeks and we'll see where we're at but I'm not going to relieve you at this point and I'm going to ask counsel to go on and brief this."

The trial court told both sides to be "ready to proceed and if a lawyer comes in he or she can tell me what they need . . . these things have a tendency to drag out, promises, promises, promises. [¶] If they're going to hire a lawyer . . . fine, but I'm not going to let a month go by and just be back in the same position. [¶] So I'll put it over two weeks and I want both of you to brief the issue." The court ended the hearing by saying: "So just tell the family that if new counsel is going to come in and say they're not going to be ready they better be prepared to tell me that they've been retained, how much time they need to be prepared on this and why it's going to take that amount of time; okay?" The court directed both parties to "brief the [sentencing] issue."

On April 26, 2013, the People filed a sentencing memorandum. In describing Alonzo's original sentencing, the People's memorandum stated: "The court selected the only legal sentence for each count, 40 years to life, and then used its discretion to sentence Defendant consecutively as to all four counts for a grand total of 160 years to life. The appellate court returned the Defendant's matter to the trial court for resentencing in harmony with the new [case law] regarding the sentencing of juveniles for non-homicide cases." ~(Sentencing memo, p. 1-2)~ Noting the California Supreme Court's recent decision in *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*), the memorandum argued Alonzo should be sentenced concurrently on the four attempted murder convictions in order to "avoid violating the *Caballero* rule." (Sentencing memo, p. 4)

At the April 26 hearing, the trial court began by saying to Slater:

"The Court: All right. What's the situation? [¶] I think I gave Mr. Alonzo this time to hire an attorney and I see you here. [¶] Has he hired an attorney?

11

"Mr. Slater: Your Honor, what the family told me is they . . . hired Patrick Aguirre but I haven't heard from him and they were paying him money supposedly and he won't come to court unless he had his complete retainer.

"The Court: So they haven't hired –

"Mr. Slater: Well, they've given him money. They have not hired him but they've been giving him money.

"The Court: Yeah. Well, that's different. You said hired. I'm just saying it's a contradiction of terms when you tell me that he has not received all the money he needs and is not appearing. [¶] . . . [¶] . . . [Y]ou know, these things tend to just go on and on and on and . . . the court keeps preparing on this and I see no reason to continue it. [¶] So the family is still trying to raise the money? [¶] That's the situation?

"Mr. Slater: No. They've actually paid him money.

[¶] . . . [¶] [Slater apparently confers with Alonzo.]

"Mr. Slater: . . . [W]hat I understand [is] they actually paid him money but not enough.

"The Court: Yeah. That's what I'm saying. You know, he's not accepted the case so . . . that can go on forever. You know, I don't know how much he still needs, whether they are capable of getting that together, how long it would take if they could. I mean, it's completely speculative. And . . . you ask the court to just buy a pig in a poke and keep putting this over and over and over ad nauseam without any real indication it's going to happen. It doesn't merit a continuance so I'm going to deny the motion for continuance."

The trial court then proceeded to the resentencing. Defense counsel Slater acknowledged that, although he had received the prosecution's sentencing memorandum, he had not filed any sentencing recommendations on behalf of Alonzo, saying: "I didn't because . . . under the statutory minimums there is not much the court

12

can do. Other than for me to ask for a [section] 1385 motion[6] and give Mr. Alonzo his original sentence there is not much more I could ask the court to do legally or statutorily except 1385." According to the parties, Slater's comment about a section 1385 motion asking the court to impose Alonzo's "original sentence" referred to the 20-year proposed plea bargain term that the trial court had refused to accept on the eve of Alonzo's trial.

The trial court denied defense counsel's section 1385 request and followed the prosecution's recommendation that Alonzo be resentenced to a total term of 40 years to life by running the sentences on his four premeditated attempted murder convictions concurrently, rather than consecutively.

c. *Discussion*.

Alonzo complains that, when the trial court denied him a one-month continuance on April 12, its comments "demonstrate (a) predominant concern with the court's own convenience and (b) a lack of appreciation for difficulties the average person faces in retaining legal representation." He asserts the court did not have "a legitimate, let alone [a] compelling reason" to deny him "a short continuance to secure attorney Aguirre."

The Attorney General argues "the trial court had already given appellant one 30-day continuance, and a second 14-day continuance, to prepare for a simple sentencing proceeding. The trial court gave appellant a very clear and explicit warning on the occasion of his second continuance that it would not be inclined to grant further continuances based on some speculative attempt at fundraising for money to hire a new attorney." "The record makes it abundantly clear that trial defense counsel Mr. Slater had no idea whether the family would be able to secure enough money to retain

---

[6]    Section 1385, subdivision (a), provides, in pertinent part: "The judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons for the dismissal shall be stated orally on the record." This includes the power to dismiss Three Strikes prior felony conviction allegations (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 527-528), as well as ordinary sentencing enhancement allegations (*People v. Thomas* (1992) 4 Cal.4th 206, 209-210).

13

Mr. Aguirre, or when that might actually happen. The trial court gave appellant every opportunity to hire privately-retained counsel, but appellant failed to provide any indication that he would be able to do so in a timely manner. The court was not required to keep giving appellant continuances indefinitely based on scant and vague assurances that he would eventually find the money to retain Mr. Aguirre."

We conclude Alonzo has failed to carry his burden of establishing that the trial court abused its discretion by " 'exceed[ing] the bounds of reason, all circumstances being considered.' " (*People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1181.)

"The constitutional right to choice of counsel . . . is not absolute. One of the express limitations upon the right to choose one's own attorney is that the criminal defendant be 'financially able' to retain his counsel of choice. [Citations.]" (*United States v. Friedman* (D.C. Cir. 1988) 849 F.2d 1488, 1490, fn. omitted.) "A defendant's right to secure counsel of choice is cognizable only to the extent defendant can retain counsel with private funds. [Citation.]" (*United States v. Mendoza-Salgado* (10th Cir. 1992) 964 F.2d 993, 1014, fn. 12.) As our Supreme Court said in *People v. Courts* (1985) 37 Cal.3d 784: "Both this court and the United States Supreme Court have emphasized that trial courts have the responsibility to protect a *financially able* individual's right to appear and defend with counsel of his own choosing." (*Id*. at p. 790, italics added.)

The trial court here had a legitimate question as to whether Alonzo or his family possessed the financial ability to retain new counsel. The information provided to the court appeared to indicate that Alonzo, or at least his family, had spoken to Patrick Aguirre and attempted to engage his services, but that a retainer agreement could not be finalized because of a lack of money. Alonzo failed to provide the trial court with an assurance his family would be able to raise the money that Aguirre – who never made an appearance, or contacted the trial court, or even communicated with Alonzo's current attorney – was apparently demanding. No member of Alonzo's family contacted the trial court or provided a written statement indicating when the financial arrangements would be completed. As a result, the trial court was justifiably concerned that (in the

14

court's own words) it had been left entirely uncertain whether Alonzo's family was "capable of getting that together, how long it would take if they could. I mean, it's completely speculative."

It is well-recognized "that a defendant's right to choose a particular counsel must be weighed against administration-of-justice concerns." (*United States v. Neal* (1st Cir. 1994) 36 F.3d 1190, 1205-1206.) As our Supreme Court said in *Walker v. Superior Court* (1991) 53 Cal.3d 257, "[w]e have often recognized the 'inherent powers of the court . . . to insure the orderly administration of justice' " (*id*. at p. 266), and it cannot "be questioned that courts have inherent authority to control their own calendars and dockets" (*id*. at p. 267). "[T]he right to retain counsel of one's own choice is not absolute. The right 'cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice, and deprive such courts of the exercise of their inherent powers to control the same.' The public has a strong interest in the prompt, effective, and efficient administration of justice; the public's interest in the dispensation of justice that is not unreasonably delayed has great force." (*United States v. Burton* (D.C. Cir. 1978) 584 F.2d 485, 489, fns. omitted.)

The remittitur issued on February 6, 2013. The trial court granted an initial continuance on March 15, and did not deny any further continuances until April 26, almost six weeks later. Hence, there was a considerable period of time during which Alonzo and his family could have retained private counsel. Given the particular circumstances of this case, we cannot say the trial judge's denial of another continuance constituted an abuse of discretion.

2. *Alonzo's sentence did not violate the Eighth Amendment.*

Alonzo contends the 40-years-to-life term that he received upon resentencing violated the Eighth Amendment because he was a juvenile when he committed these nonhomicide crimes, and his sentence is the functional equivalent of life without possibility of parole (LWOP).[7] We disagree.

a. *The remand for resentencing in* Alonzo I.

Alonzo was 17 years old at the time of the shooting. In *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1], the court held that juveniles must be treated differently than adults when it comes to sentencing. "*Roper* established that because juveniles have lessened culpability they are less deserving of the most severe punishments. [Citation.] As compared to adults, juveniles have a ' "lack of maturity and an underdeveloped sense of responsibility" '; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' [Citation.] These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citation.] Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.'. . ." (*Graham v. Florida* (2010) 560 U.S. 48, 68 [176 L.Ed.2d 825] (*Graham*).) *Roper* concluded the imposition of capital punishment on juvenile offenders for any offense whatsoever violated the Eighth Amendment. *Graham* held the imposition of a life-without-possibility-of-parole sentence on a juvenile offender for a nonhomicide offense violated the Eighth Amendment. *Miller v. Alabama* (2012) 132 S.Ct. 2455, 2469 [183 L.Ed.2d 407] (*Miller*), held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," although a court might, in its discretion, impose such a punishment.

---

[7] Currently pending before our Supreme Court is *In re Bonilla*, review granted Feb. 19, 2014, S214960, which includes the issue of whether a 50-years-to-life term is the functional equivalent of life without possibility of parole for a 16-year-old offender.

16

In *People v. Caballero*, *supra*, 55 Cal.4th 262, 268, our Supreme Court concluded that, under the reasoning of these United States Supreme Court cases, "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Caballero* reasoned: "*Miller* . . . made it clear that *Graham*'s 'flat ban' on life without parole sentences applies to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of a life without parole sentence imposed in this case. [¶] Defendant in the present matter will become parole eligible over 100 years from now. (§ 3046, subd. (b) [requiring defendant to serve a minimum of 110 years before becoming parole eligible].) Consequently, he would have no opportunity to 'demonstrate growth and maturity' to try to secure his release, in contravention of *Graham*'s dictate. (*Graham*, *supra*, 560 U.S. at p. [73], [130 S.Ct. at p. 2029]; see *People v. Mendez* (2010) 188 Cal.App.4th 47, 50–51 . . . [holding that a sentence of 84 years to life was the equivalent of life without parole under *Graham,* and therefore cruel and unusual punishment].) *Graham*'s analysis does not focus on the precise sentence meted out. Instead, as noted above, it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime. [Citation.]" (*Id*. at pp. 267–268, fn. omitted.)

In *Alonzo I*, we concluded Alonzo's sentence of 160 years to life was unconstitutional under *Caballero* because it was the functional equivalent of a life-without-possibility-of-parole term for a juvenile in a nonhomicide case. Therefore, we vacated his sentence and remanded to the trial court for resentencing.

b. *Alonzo's new sentence is not the functional equivalent of LWOP.*

Alonzo contends the 40-years-to-life prison term he received upon resentencing violates the Eighth Amendment because it amounts to the functional equivalent of life without possibility of parole. He argues that, in practical terms – given his age at the time of sentencing – his 40-years-to-life term means that he would have to serve "in

17

excess of 36 years in state prison, making him 55 years old prior to being merely *eligible for consideration* for parole." Alonzo arrives at this number by assuming the Board of Prison Terms will set a "base term" for minimum parole eligibility that will result in an effective sentence of 46 years to life, from which he subtracts seven years for presumed good time credit, and also subtracts 988 days presentence custody credit. The Attorney General disputes Alonzo's math, asserting: "In truth, appellant will be eligible for parole when he serves 85 percent of 40 years, which is 34 years. Thus, he will actually be eligible for parole when he is approximately 51 years of age."

We conclude that a prison term making Alonzo parole eligible at age 55, given that his life expectancy (according to Alonzo) is more than 71 years, does not constitute the functional equivalent of an LWOP sentence. (Compare *People v. Perez* (2013) 214 Cal.App.4th 49, 58 ["by no stretch of the imagination" could parole eligibility by age 47 be deemed the functional equivalent of LWOP].)

Alonzo himself "acknowledges that parole eligibility at 55 is within the 'normal life expectancy of a healthy person of defendant's age and gender living in the United States.' (*People v. Caballero*, *supra*, 55 Cal.4th at p. 267; see, U.S. Dept. Health and Human Serv., *Health, United States, 2013*, p. 82 [as of 2010, the average life expectancy of one born in 1990 is 71.8 years].)" However, citing two academic studies,[8] Alonzo argues that "[t]he life expectancy of an incarcerated male is statistically substantially shorter than that of the 'normal . . . healthy' unincarcerated one mentioned in *Caballero*." Hence, he concludes, "there is a reasonable statistical likelihood that [he] will not survive the parole eligibility term."

---

[8] Alonzo cites Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003* (2013) 103 Am. J. Public Health, 523, and Hogg, et al., *Years of Life Lost to Prison: Racial and Gender Gradients in the United States of America* (2008) 5 Harm Reduction J. No. 4.

18

We decline Alonzo's invitation to consider these academic studies for two reasons. First, it does not appear that either study was before the trial court and, therefore, neither is part of the record on appeal. "It is elementary that the function of an appellate court, in reviewing a trial court judgment on direct appeal, is limited to a consideration of matters contained in the record of trial proceedings, and that 'Matters not presented by the record cannot be considered on the suggestion of counsel in the briefs.' " (*People v. Merriam* (1967) 66 Cal.2d 390, 396-397, fn. omitted, disapproved on other grounds in *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 882; see, e.g., *People v. Amador* (2000) 24 Cal.4th 387, 394 [on appeal from grant of suppression motion, Supreme Court denied Attorney General's request for judicial notice (of maps and information from the U.S. Postal Service) to establish location of residence where contested search occurred, because "[t]hese documents were not before the trial court"].)

Second, in *Caballero* our Supreme Court stated that "the term 'life expectancy' means the normal life expectancy of a healthy person of defendant's age and gender living in the United States." (*People v. Caballero*, *supra*, 55 Cal.4th at p. 267, fn. 3.) This definition does not appear to make any special allowance for other kinds of life expectancies. *Caballero* certainly did not purport to be referring to an average prison inmate's life expectancy. What violated the Eighth Amendment in *Caballero* was "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy" because "a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime." (*Id.* at p. 268.) That did not happen here.

We conclude that Alonzo's 40-years-to-life prison term does not violate the Eighth Amendment.

19

3. *Alonzo was not denied effective assistance of counsel at the resentencing hearing.*

Alonzo contends he was denied effective assistance of counsel at the resentencing hearing because his attorney failed to effectively advocate for a lower term. There is no merit to this claim.

a. *Legal principles.*

"We explained in *Strickland* [*v. Washington* (1984) 466 U.S. 668 (104 S.Ct. 2052) (*Strickland*)] that a violation of [the Sixth Amendment right to effective assistance of counsel] has two components: [¶] 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citation.] [¶] To establish ineffectiveness, a 'defendant must show that counsel's representation fell below an objective standard of reasonableness.' [Citation.] To establish prejudice he 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Williams v. Taylor* (2000) 529 U.S. 362, 390-391 [120 S.Ct. 1495].)

"In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny" in order to avoid "the adverse consequences that systematic 'second-guessing' might have on the quality of legal representation provided to criminal defendants and on the functioning of the criminal justice system itself." (*People v. Ledesma* (1987) 43 Cal.3d 171, 216.) "We cautioned in *Strickland* that a court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a

20

particular act or omission of counsel was unreasonable in the harsh light of hindsight. [Citation.]" (*Bell v. Cone* (2002) 535 U.S. 685, 702 [122 S.Ct. 1843], italics added.)

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697.)

b. *Discussion.*

It appears that Alonzo's attorney could have done more in advocating for a reduced sentence. Defense counsel failed to provide the sentencing memorandum that the trial court had requested from both parties, even though the prosecution had submitted one. Defense counsel did not remind the trial court of its authority to dismiss the gang enhancement in the interest of justice, which could have reduced the sentence to a term of 32 years to life. Nor did defense counsel remind the trial court of the mitigating factors he had argued during Alonzo's original sentencing hearing in 2009.[9]

---

[9] According to the Attorney General, defense counsel at the 2009 sentencing hearing told the trial court that " 'prior to this case, [Alonzo] had no real convictions, no prior record, no history. He did have some arrests, but there were no petition[s] or complaint[s] filed. He was young at the time of his arrest. He was 17-years-old, and he has a child . . . .' "

However, we need not reach *Strickland*'s deficiency prong because it is clear to us that Alonzo cannot make out the prejudice prong. There is nothing in the record indicating the trial court believed that it lacked the authority to strike the gang enhancement.[10] The only reason for the remand, as the trial court expressly acknowledged, had been to reconsider Alonzo's sentence in light of new case law governing juvenile sentencing. Most significantly, the trial court reduced Alonzo's sentence from a 160-years-to-life term down to a 40-years-to-life term, a very substantial reduction. Alonzo has not shown " 'a reasonable probability that, but for counsel's . . . errors, the result of the proceeding would have been different.' " (*Williams v. Taylor*, *supra*, 529 U.S. at p. 391.)

Alonzo argues that we should revise standard ineffective assistance of counsel jurisprudence by doing away with *Strickland*'s prejudice prong and announcing that incompetency of counsel is reversible per se. He asserts "the *Strickland* standard erroneously imported reliability concerns relevant to violation of the Due Process Clause of the Fourteenth Amendment into evaluation of the deprivation of what is recognized as a Sixth Amendment right. It is time for the courts to take a fresh look at the 'reasonable probability' prejudice prong of the *Strickland* standard." Needless to say, we decline this invitation in light of *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction."]).

We reject Alonzo's claim that he was denied the effective assistance of counsel at the resentencing hearing.

---

**10** The prosecutor told the trial court during the April 12 hearing that it could strike the gang enhancement, which would result in a term of 32 years to life. The prosecutor repeated this several times. Although the prosecution's subsequent memorandum ignored this sentencing authority (and described Alonzo's original 40-years-to-life term as "the only legal sentence"), only two weeks had gone by between the April 12 hearing and Alonzo's resentencing on April 26.

**DISPOSITION**

The judgment is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



ALDRICH, J.



LAVIN, J.